

EXHIBIT A

BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE MENU FOODS POISONED PET FOOD LITIGATION ) ) ) ) | No. MDL 1850 – In re Pet Food Products Liability Litigation |

## PLAINTIFFS' RESPONSE TO MOTION FOR TRANSFER AND CONSOLIDATION AND REQUEST FOR TRANSFER AND CONSOLIDATION OF RELATED ACTIONS TO THE WESTERN DISTRICT OF ARKANSAS UNDER 28 § 1407

Plaintiffs Scott and Barbara Widen, Charles Ray and Pamela Simms, Sandra Gray, Kirby Cooper, and Nick and Deena Jackson ("Plaintiffs") submit this response in support of their request to transfer and consolidate related actions to the Western District of Arkansas under 28 U.S.C. § 1407.

### I.   FACTS

**A.   Background**

Defendant, Menu Foods, is a Canadian corporation doing business in the United States; Defendant, Nestle Purina, is a Missouri Corporation, with a pet food division in Fayetteville, Arkansas; and Defendant, Proctor & Gamble, is headquartered in Cincinnati, Ohio with offices in Fayetteville, Arkansas. Defendants distribute their pet food throughout the United States. Defendant, Del-Monte Pet Products, headquartered in San Francisco, California allegedly

1

produced contaminated pet food at their Lawrence, Kansas facility which is also closer to the Western District of Arkansas than any other currently suggested forum. These Defendants make a variety of pet food sold under many brand names and many private labels. Defendant, ChemNutra, Inc., (ChemNutra) is a Nevada Corporation which is alleged to have produced the contaminated wheat gluten. ChemNutra also has a production facility in Kansas which is closer to the Western District of Arkansas than any other currently suggested forum. The single largest distributor of Defendants' products is Wal-Mart Stores, Inc. (Wal-Mart). Wal-Mart has a private label agreement with Menu Foods and other producers of pet food in which Wal-Mart agrees that producer would manufacture pet food exclusively for Wal-Mart, thereby allowing Wal-Mart to purchase the pet food at a discounted rate and increase their profit margins and/or eliminate competition. Wal-Mart attaches its own name and reputation to each package of pet food manufactured under a private label agreement.

Plaintiffs assert their claim against the Defendants as class actions under Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased any cat or dog food that was produced by Defendants from any Wal-Mart, Sam's Club, or any other retail outlet. Plaintiffs seek compensation for those whose pets suffered harm due to the consumption of defendants' tainted pet foods, those who accrued veterinarian bills due to actual harm to their pet, and those who accrued veterinarian bills because of their concern of possible harm from their pet's consumption of Defendants' tainted pet food. Plaintiffs seek reimbursement for those who purchased the tainted pet food and were forced to dispose of the contaminated food and replace it with untainted pet food, and punitive damages.

2

Defendant, Menu Foods, told the U. S. Food and Drug and Administration that they had become aware of the contamination on February 20, 2007. Menu Foods believed that the contamination came from their supplier of wheat gluten. Defendant, Menu Foods, conducted test to determine if the contamination was harmful to pets on February 27, 2007. The results of the test resulted in death to one out of every six pets who consumed the contaminated pet food.

Defendants and Wal-Mart did nothing to prevent the distribution of the contaminated pet food until weeks after the discovery occurred. This action, or lack thereof, permitted and caused additional harm to thousands of pet owners throughout the country.

**B.     The Poisoned Pet Food Class Actions**

Thus far, over 75 class action complaints have been filed against the Defendants. These lawsuits assert claims for injuries arising from the deaths of pets that had consumed Defendants' pet food sold under various labels and some of the suits narrow the class to those who purchased Defendants' products sold at Wal-Mart stores. (See attached list of cases).

These cases seek to recover damages on behalf of all persons whose pets became sick or died as a result of consuming pet food produced or sold by defendants, persons who accrued costs from veterinarian visits, and persons who were forced to dispose of contaminated pet food and replace it with non-contaminated food. Submitted herewith is a Schedule of Actions involved under 28 U.S.C. § 1407 that lists the actions to be transferred and consolidated.

Plaintiffs seek to have the aforementioned cases and all other cases involving the contamination of Defendants' pet food transferred to the Western District of Arkansas for centralization with the four class actions already pending in that jurisdiction. Transfer and consolidation is appropriate because these cases involve common factual questions, will further

3

the convenience of the parties and witnesses, and will promote the just and efficient conduct of these actions. The Western District of Arkansas is the appropriate place for transfer and consolidation for the following reasons: the district has the resources and judicial expertise to properly conduct this case, Defendants transact business in the district, Defendants largest customer and distributor is in the district, Defendant, Wal-Mart, is headquartered in the district. Defendant, Menu Foods' plant, which is allegedly responsible for the production of the vast majority of the contaminated food, is located within one hour of the district,[1] and every other domestic defendant has production facilities within three hundred miles of the Western District of Arkansas.[2] Additionally, four related class actions are already filed in the district, and the Western District of Arkansas is easily accessed by all parties.

## II.   Argument

### A.   Transfer and Consolidation of All Poisoned Pet Food Actions for Coordinated Pretrial Proceedings is Appropriate.

28 U.S.C. § 1407 authorizes this Panel to transfer and consolidate two or more civil cases for coordinated pretrial proceedings upon a determination that (i) they "involv[e] one or more common questions of fact," (ii) transfer will further "the convenience of the parties and witnesses," and (iii) transfer "will promote the just and efficient conduct of the actions." The requirements for transfer under Section 1407 are clearly satisfied here.  The numerous related poisoned pet food class actions are characterized almost entirely by common questions of fact. In addition, transfer and consolidation will promote convenience for the parties and efficiency in

---

[1] Google Map Search
[2] Google Map Search

the pretrial proceedings by eliminating duplicative discovery and the potential for inconsistent rulings, including determinations on class certification.

1.  **The related actions involve common questions of fact.**

The first requirement of § 1407 - that the actions to be transferred involve common questions of fact - is satisfied. The factual issues to be determined in each of the actions proposed for transfer and coordination arise from the same course of conduct and, therefore, are identical. See *In re Neurontin Mktg. & Sales Practices Litig.*, 342 F. Supp. 2d 1350, 1351 (J.P.M.L. 2004); *In re Publ'n Paper Antitrust Litig.*, 346 F. Supp.2d 1370, 1371 (J.P.M.L. 2004).

Among the many common questions of law and fact at issue in the related actions are:

1) Whether the Defendants' pet food was materially defective, and unfit for consumption by a domesticated pet;

2) Whether the Defendants breached any contract, implied contract or warranties relating to the sale of the pet food;

3) Whether the Defendants' pet food caused Plaintiffs' and other Class members' pets to become ill;

4) Whether the Defendants' contaminated pet food and the warnings surrounding the contaminate caused Plaintiffs to incur veterinarian costs;

5) Whether the Defendants' contaminated pet food and subsequent warnings surrounding the contamination caused Plaintiffs to dispose of the contaminated pet food and purchase new uncontaminated pet food;

6) Whether the Plaintiffs and other Class members have been damaged, and, if so, what is the proper measure thereof;

5

7) What is the appropriate form of injunctive, declaratory, and other relief; and

8) Do the Defendants' actions or lack thereof warrant punitive damages;

The factual issues to be determined in all of the class actions are nearly identical, making transfer to a single forum highly appropriate. See, e.g. *Neurontin*, 342 F. Supp.2d at 1351. In *Neurontin*, for example, the Panel ruled that there were common issues warranting transfer and consolidation where "[a]ll actions [we]re purported class actions involving allegations that common defendants have engaged in the illegal promotion and sale of the drug Neurontin for 'off-label' use." *Id.*

### 2. Consolidating the class action will further the convenience of the parties and the witnesses.

Consolidating the class actions will satisfy the second requirement for consolidation under § 1407 because it will serve the convenience of the parties and witnesses. It is expected that counsel for Plaintiffs in all actions will seek documents from the same Defendants on such issues as, inter alia; (a) where the recalled pet food was processed, (b) the manufacturing process for the recalled pet food, (c) the intended ingredients of the recalled pet food, (d) the name, composition and character of the contaminant(s) of the recalled pet food that poisoned the Class members pets, (e) the contaminant(s)' pathway into the recalled pet food, (f) Wal-Mart's contractual relationship with Defendants (g) when Defendants learned or should have learned that the recalled pet food was contaminated, and (h) what actions were taken when Defendants did learn of the contamination. Issues such as these will be central in all of the class actions.

Because the actions arise from a common nucleus of factual allegations, there is a strong likelihood of duplicative discovery demands and redundant depositions. Consolidation will

6

enable a single judge to establish a pretrial program that will minimize the inconvenience to the witnesses and expenses to the parties. These savings are precisely the types of savings that this Panel has traditionally used to justify the consolidation of actions in different jurisdictions. See e.g. *Neurontin*, 342 F. Supp.2d at 1351.

### 3. Transfer and consolidation will promote the just and efficient conduct of the related actions.

Finally, transferring and consolidating these class actions is appropriate because coordinating the pretrial proceedings will promote the just and efficient conduct of the actions. In light of the nearly identical factual allegations, and especially given that discovery has not yet begun in any action, transfer under § 1407 will avoid duplicative discovery and save judicial time and resources. See *Ephedra Prods. Liab. Litig.*, 314 F.Supp.2d at 1375. The Plaintiffs in each action will seek to depose many of the same individuals from Defendants and their various affiliates and request production of a substantially similar set of documents. Failing to consolidate these actions will therefore result in duplicative discovery efforts, requiring witnesses to appear for multiple depositions and defendants to produce several sets of the same documents. The consolidation and coordination of these actions would avoid this inconvenience and needless waste of resources. See *In re Univ. Serv. Fund Tel. Billing Practices Litig.*, 209 F. Supp.2d 1385, 1386 (J.P.M.L. 2002). Moreover, the corresponding savings in time and expense would confer benefits upon both the Plaintiffs and Defendants. See *In re Cygnus Telcoms. Tech., LLC Patent Litig.*, 177 F.Supp.2d 1375,1376 (J.P.M.L. 2001). Where, as here, consolidation and coordination will avoid duplicative discovery and potentially conflicting pretrial rulings, transfer for pretrial purposes is warranted to promote the interests of judicial economy and efficiency.

7

**B.     The Western District of Arkansas is the Proper Forum for Coordinated Pretrial Proceedings.**

      **1.     The Western District of Arkansas has a small and swift docket and can most efficiently conduct the MDL proceedings.**

In selecting the most appropriate transferee forum for multidistrict litigation (MDL), the Panel considers the speed and efficiency with which alternative districts manage their respective caseloads. *See, In re Preferential Drug Prods. Pricing Antitrust*, 429, F. Supp. 1027, 1029 (J.P.M.L. 1977) (transferring cases based in part upon transferee courts low median time between filing and disposition in civil actions); *In re Corn Derivatives Antitrust Litig.*, 486 F. Supp. 929, 932 (J.P.M.L. 1980). (faster docket cited as reason for selecting transferee court). Here, this factor favors the Western District of Arkansas.

The Western District of Arkansas has one of the smallest dockets in the country. It is unburdened by any existing MDL and very capable of ensuring expeditious resolution of this MDL. If there are several forums which would be appropriate for MDL transfer, the MDL Panel should examine the relative caseloads in each district court as a factor in determining where the MDL should be sent. *See, e.g.., In re Corn Derivatives Antitrust Litig.*, 486 F. Supp. 929, 932 (J.P.M.L. 1980); *In re Falstaff Brewing Corp. Antitrust Litig.*, 434 F. Supp. 1225, 1231 (J.P.M.L. 1977). While the Western District of Arkansas not only is the most convenient and suitable forum for an MDL, it also has one of the smallest caseload of all the districts and can proceed to trial faster than any other district.

The Western District of Arkansas enjoys a swift civil docket. The Western District of Arkansas has one of the shortest amounts of time between the filing of a complaint and the trial

date. The median time for civil cases from filing to trial in the Western District of Arkansas is only 13.0 months, while the average length of time for district courts across the country is 23.2 months.[3] Additionally, the Western District of Arkansas, while possessing the resources necessary to oversee a complex multi-party action such as this, has been under utilized as a transferee court for centralized proceedings. To the Respondents' knowledge, the Western District of Arkansas has never been assigned an MDL proceeding. This may have been due to the historical difficulty in traveling to the Western District of Arkansas. However, with the growth of Wal-Mart and the Regional Airport in Northwest Arkansas, direct flights are now available from New York, Chicago, Atlanta, Dallas, Los Angeles, Miami, Washington DC, and countless other metropolitan areas.[4] While the Western District of Arkansas has never received a MDL proceeding, many other possible forums have multiple MDL's currently pending. As of September 30, 2006, the Western District of Washington had two (2) MDL cases still pending, the District of New Jersey has fifteen (15) MDL cases pending, the Northern District of Illinois has sixteen (16) MDL cases pending, and the Central District of California has nine (9) MDL cases pending.[5]

### 2.     The Western District of Arkansas Has Judges Experienced in Complex Class Actions.

The Western District of Arkansas has increasingly become a hotbed for complex class action litigation. Because Wal-Mart, the country's largest retailer, is headquartered in the Western District of Arkansas, all the district's judges have been exposed to many national class action cases involving product liability. Judge Robert Dawson has ample experience with

---

[3] U.S. Federal Courts Website: Information for 2006.
[4] Northwest Arkansas Regional Airport Web Site.
[5] U.S. Federal Courts Website.

complex class action cases. Judge Robert Dawson is also capable and experienced in handling complex litigation. Finally the District's Chief Judge, Judge Jimm Hendren has years of experience in dealing with product liability cases. All of the judges in the district are capable of administering an MDL proceeding and none of them are currently overburdened with an exhaustive docket. Each possible transferee judge in the Western District of Arkansas has a wealth of experience in complex commercial class actions and would be well-suited to handle this litigation.

3. **The Western District of Arkansas is the most convenient forum for the convenience of the parties and witnesses.**

The convenience of the parties and witnesses is a factor in determining to which district related actions should be transferred. 28 U.S.C. § 1407(a) (related actions may be transferred to a district for coordinated proceedings upon a determination that the transfer "will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions"). In deciding whether a particular forum is convenient, the Panel may consider the location of the parties, documents and potential witnesses relative to that district. See *In re Cigarette Antitrust Litig.*, 2000 U.S. Dist. Lexis 8209, at *4 (J.P.M.L. June 7, 2000).

This factor also supports Respondents' position that the MDL be transferred to the Western District of Arkansas. This case will involve parties from all over the United States and even Canada. Arkansas is conveniently located in between both coasts and therefore accessible to all parties.

One of the Defendant's plants where the contaminated pet food was produced is located

in Peoria Kansas, which is only 51.4 miles from the Western District of Arkansas.[6] Much of the discovery will undoubtedly revolve around how the pet food was produced at the Peoria, Kansas plant became contaminated and what kind of quality control mechanisms were in place. Defendant, Nestle Purina, has a pet food division located in the Western District of Arkansas and a production plant in Nebraska, which is closer to the Western District of Arkansas than any other currently proposed forum. Additionally, Defendant, Proctor and Gamble, Inc., has a large regional corporate offices in the Western District of Arkansas. Defendant, Del-Monte Pet Products, has their production facility in Lawrence, Kansas which is where most of the discovery will focus and is closer to the Western District of Arkansas than any other currently proposed forum. ChemNutra, Inc. has a plant in Kansas, only a few hours from the Western District of Arkansas and closer than any other currently proposed MDL forum.[7] Therefore, the Western District of Arkansas provides a very convenient forum to address these inevitable discovery matters.

Another Defendant in many of the lawsuits is Wal-Mart Stores, Inc. (Wal-Mart). Wal-Mart is the single largest distributor of Defendants' pet food in the country and had a private label agreement with Defendants by which Defendants would produce several brands of pet food exclusively for Wal-Mart. As such, Wal-Mart is and indispensable party to this lawsuit. Wal-Mart is, likely, the first place that consumers would have lodged complaints about the pet food. Many of the lawsuits seek reimbursement for the purchases of the contaminated pet food. These purchases were not made from Defendants directly, they were made at retail outlets - most of

---

[6] Google Map Search – Peoria, KS to Bella Vista, AR
[7] Google Map Search

11

which were made at Wal-Mart. Accordingly, it would be nearly impossible to calculate the level of reimbursement without pricing information from Wal-Mart.

Additional discovery will include the Plaintiffs acquisition of copies of the private label agreements between Wal-Mart and Defendants to determine the relationship between the two companies. Plaintiffs will also need information from Wal-Mart regarding the amount of Defendants' pet food which was purchased during the time at issue. Plaintiffs will need to seek information from Wal-Mart relating to the timing of the first customer complaints.

For the reasons mentioned above, Wal-Mart is a necessary party to the action. Wal-Mart's corporate headquarters is located within the Western District of Arkansas and is only about 57 miles from the Menu Foods plant in Peoria, Kansas.[8] Nestle Purina, another Defendant who allegedly allowed contaminated pet food to enter the stream of commerce, has a pet food division in Fayetteville, Arkansas which is located in the heart of the Western District of Arkansas. Proctor & Gamble, Defendant who allegedly allowed contaminated pet food to be produced, also has a large regional headquarters in the Western District of Arkansas. Defendant, Del-Monte Pet Products, has a production facility in Lawrence, Kansas which is only a few hours drive from the Western District of Arkansas. Therefore, discovery will be most convenient for all parties if the MDL proceedings are administered by the Western District Court of Arkansas.

A common misconception is that Arkansas is a difficult destination point. This may have been true in the past but due to the phenomenal economic growth of several Fortune 500 companies, the Northwest Arkansas Regional Airport (XNA) services one of the most extensive

---

[8] Google Map Search

list of direct flights in the nation. XNA has direct flights from New York, Los Angeles, Denver, Cincinnati, Miami, Minneapolis, Chicago, Atlanta, Dallas, Houston, Charlotte, Detroit, Salt Lake City, Newark, and others.[9] The Western District of Arkansas is by far the most convenient forum both for discovery purposes and travel arrangements for all parties involved.

### III. CONCLUSION

Consolidation is necessary to avoid duplication and wasted efforts. Transfer to the Western District of Arkansas is appropriate because at least four of the related actions were filed there; the Western District of Arkansas has the swiftest docket of all districts; the Judges are experienced and capable of conducting an MDL proceeding and are not overburdened with other MDL cases; the Western District of Arkansas is centrally located, easily accessible, and in close proximity to the nucleus of the discovery process. Therefore, Plaintiffs respectfully request that the Panel order that the related actions, as well as any other cases that may be subsequently filed asserting related or similar claims, be transferred to the Western District of Arkansas for consolidated and coordinated pretrial proceedings.

---

[9] Northwest Arkansas Regional Airport Website

DATED:  April 16, 2007          PATTON, ROBERTS, MCWILLIAMS,
                                & CAPSHAW, L.L.P.

                                By: _____
                                Jeremy Y. Hutchinson
                                Jack Thomas Patterson II
                                Stephens Building
                                111 Center St., Suite 1315
                                Little Rock, AR 72201
                                Telephone: (501) 372-3480
                                Facsimile: (501) 372-3488

                                Richard Adams
                                James C. Wyly
                                Sean F. Rommel
                                **PATTON, ROBERTS, MCWILLIAMS
                                & CAPSHAW, L.L.P**
                                Century Bank Plaza, Suite 400
                                P.O. Box 6128
                                Texarkana, Texas 75505-6128
                                Telephone: (903) 334-7000
                                Facsimile: (903) 334-7007

                                Timothy C. Hutchinson
                                **WILLIAMS & HUTCHINSON LLP**
                                5417 Pinnacle Point Drive, Suite 500
                                Rogers, AR 72758
                                Telephone: (479) 464-4944

                                Bill G. Horton
                                **NOLAN, CADDELL, & REYNOLDS, P.A.**
                                5414 Pinnacle Point Drive, Suite 101
                                Rogers, AR 72758
                                Telephone: (479) 782-5297
                                Facsimile: (479) 782-5184

                                Jason M. Hatfield
                                **LUNDY & DAVIS LLP**
                                3000 N. College Avenue, Suite 309
                                Fayetteville, AR 72701
                                Telephone: (479) 527-3921
                                Facsimile: (479) 587-9196

                                **ATTORNEYS FOR PLAINTIFFS**